Clifton Aaron MARTIN, Plaintiff in Error

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13178.

Court of Criminal Appeals of Oklahoma.

Oct. 17, 1962.

Rehearing Denied Nov. 7, 1962.

Valdhe F. Pitman and Malcolm Baucum, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., D. C. Thomas, Asst. Oklahoma County Atty., for defendant in error.

NIX, Presiding Judge.

Clifton Aaron Martin, hereinafter referred to as the defendant was charged by

Information in the District Court of Oklahoma County with the crime of Rape in the First Degree. He was tried before a jury, found guilty and his punishment fixed at 15 years in the Oklahoma State Penitentiary.

Defendant lodged his appeal in this Court in the time prescribed by law, asserting as grounds for reversal numerous assignments of error. The testimony will be briefly outlined and the assignments of error discussed in the order in which they appear in defendants brief.

Miss Melton and two female companions had gone to Elmwood Swimming Pool on the evening of July 6, 1961, about 8:00, the defendant and two male companions passed in an auto and waved and hollered at the girls. Miss Melton waved back. The boys returned about 10 minutes later and Miss Melton walked over to their car at their request, and they engaged in conversation. Miss Melton testified she talked with the boys about an hour and apparently during this time showed one of the boys' knife to her girlfriends. The boys asked her to go to a party, and she expressed a desire that there be some more girls along. Jones said he would call his girlfriend, and Gossett said he would go get some married friends to accompany them. Miss Melton then either told her companions she was going, or asked their advice on the matter. About 9:15 she accompanied Gossett when he went to get his married friends. Two boys stayed behind. Gossett and Miss Melton returned about 9:30. The three boys and Miss Melton then went back to the house of Gossett's married friends, and from there to Springlake, arriving at about 10:00 P.M. They stayed at Springlake about an hour. When they left Springlake, Miss Melton said she wanted to go home, told them she should go home, and said she did not want to go to their house. They told her to shut up, and she did, realizing she was in trouble. At the house on Commerce, Jones pushed her from the car. Inside the house, when the other two boys had gone to get beer, Gossett promised to take her home. When defendant and Jones returned according to Miss Melton, the following transpired:

"A. Well, when Martin got back they go,—they drank some beer, and they sat there talking to me,—talking about me and laughing.

"Q. What did they say?

"A. They just said that I was weird, and just made fun of me, sort of.

"Q. Were all three of the boys there?

"A. Yes, sir.

"Q. Do you know who said you were weird?

"A. Well, Martin and Gossett both said it.

"Q. Then what happened, Betty?

"A. Well, all three of them grabbed a hold of me and Gossett held me around the shoulders and Martin and Jones and, * * * Martin and Jones held my legs and pulled me down, pulled my shoes and pants.

"Q. Then what happened?

"A. They put me on the bed.

"Q. Then what happened?

"A. Well, Gossett got me on the bed * * * Gossett got on the bed with me first and they held me down and I started to hollering for them to let me up and they said I better shut up or they would use that knife on me.

"Q. What knife was that, Betty?

"A. The knives they had.

"Q. Did you ever see any knives before that time?

"A. Yes, sir.

"Q. When was the first time you ever saw any knives?

"A. At Springlake.

"Q. Who had them?

"A. Martin and Gossett.

"Q. What kind of knives were they, Betty?

"A. Just a knife is all I know.

"Q. Well, by that I mean, how long was the knife; show me with your fingers?

"A. About this long (indicating), when it was open.

"Q. You say Martin and Gossett had one?

"A. Yes.

"Q. Are those the same knives you were threatened with?

"A. Yes.

"Q. Now, who said it, who threatened you?

"A. Martin and Gossett, both.

"Q. That,—What did they say, Betty?

"A. I can't remember exactly what they said; I don't know except, they told me to shut up or they would use it on me.

"Q. Who was that that told you?

"A. Martin.

"Q. Did you shut up?

"A. Yes, I shut up the best I could.

"Q. Then what happened?

"A. They put me on the bed and held me down and told me to be quiet so I tried to do what they said.

"Q. Were you ever struck?

"A. Yes.

"Q. By whom?

"A. By Gossett.

"Q. Where?

"A. In the neck.

"Q. With what?

"A. With his hand.

"Q. Tell me in your own words, what happened, using your own words?

"A. Gossett raped me first.

"Q. What do you mean by 'raped'?

"Mr. Pitman: We object to the terminology 'raped me first'.

"The Court: That will be sustained and the jury is directed to disregard it, it is a conclusion.

"Q. Betty, exactly, just exactly tell what Gossett,—What did Gossett do?

"A. He put his sexual organs into my sexual organs.

"Q. Was penetration made, Betty?

"A. Yes.

"Q. How do you know it was?

"A. Because I felt it, it hurt awful.

"Q. How long did that last?

"A. I don't know.

"Q. Then what happened?

"A. Well, when he got through Martin come in.

"Q. How was Martin dressed?

"A. He had his clothes on when he come in but he took them all off.

"Q. Then what happened?

"A. He done the same thing that Gossett had done.

"Q. What do you mean, Betty, by the same thing, tell us exactly what he did?

"A. He put his sexual organs in my sexual organs.

"Q. Did he penetrate you?

"A. Yes, sir.

"Q. How do you know?

"A. I felt it.

"Q. All right, now you have testified about Martin?

"A. Yes.

"Q. Is Martin in the courtroom?

"A. Yes.

"Q. Where is he?

"A. Over there at that table.

"Q. Point him out to me, please.

"A. Right there (Indicating).

"Mr. Thomas: Let the record show that she pointed at the defendant, Martin.

"Q. Betty, then what happened?

"A. Well, Jones came in and took his turn.

"Q. Tell me exactly what he did?

"A. He put his sexual organs in my sexual organs.

"Q. Was penetration made, Betty?

"A. Well, not at first, I kept moving around and he got real mad and he stuck his sexual organs in my mouth."

It is unnecessary to relate in detail or to discuss further the sex orgy that took place during the time the 3 men were there with this girl. Her testimony is sufficient, if believed, to establish the crime of First Degree Rape especially when it is unrefuted as in the instant case. Miss Melton testified that when the 3 boys had finished taking turn about, they made her take a douche and placed the pillow case she had used to clean herself over her head and took her to a service station on Eastern, gave her $5.00 and let her out. During that trip, she said Jones had her head in his lap and to keep her from screaming, placed his penis in her mouth.

She testified that Martin told her not to tell anybody what happened or if she went to the police or anybody, they would know it at the same time, and the one that wasn't caught would get her. When she was let out of the car, she ran into the station, where at her request, a negro attendant called the police. They arrived and took Miss Melton to St. Anthony Hospital, where she was examined by Dr. Thomas Fraley. The doctor testified that there were several small lacerations around the vagina and on the bottom of the vagina, and there was blood in the posterior aspect of the vagina, as well as contusions of the hymen ring. He found immotile male sperm in the vagina. He said, in his opinion, she had intercourse within 2 or 3 hours.

Officer Ming testified he went to the home of Miss Melton, and after talking with her went to the vicinity of Southwest 25th and Central, where they cruised the area and observed a 1953 Black Mercury setting in the driveway of 405 S. E. Commerce. A similar car had been described by Miss Melton as the one driven by her attackers. Officer Ming looked inside the car and saw a small blue canvas bag in the back, a pair of large white dice with red spots. He opened the door on the left rear side where he found a pillow case lying on the floor board of the car. Officer Ming went to the front door of the residence and made inquiry and then proceeded to a small 2 room house in the back of this address and knocked on the door and was admitted by Glen Gossett, one of the boys with the defendant the night of the alleged Rape. He was placed under arrest. Officer Ming then drove to the place where Martin was employed, then proceeded to a bar on Southeast 15th, where Martin was placed under arrest.

Defendant's first contention of error involves the introduction of the blood stained pillow case into evidence as being the fruits of an illegal search and seizure. Defendant contends that the Officer neither had a search warrant nor a warrant for the arrest of defendant. Defendant admits the officer had probable cause to arrest defendant for the commission of a felony by information provided by the complaining witness, but he contends the search of the vehicle was not made as incident to a lawful arrest, as the search was made prior to the arrest of defendant and was at a point several miles from where he was arrested.

This argument would have been sound had it been proven that the car was owned by defendant or was in his possession. The defendant never at any time claimed ownership or legal custody or control of the automobile in question, or did he claim a proprietory right or interest therein.

When the County Attorney undertook to prove ownership of the automobile, Defense Counsel objected on the ground it was incompetent, irrelevant, and immaterial. Thus ownership was never proven. This Court has held in cases too numerous to mention, that:

"The constitutional provision guaranteeing one immunity from unlawful search and seizure belongs only to the person, effects and premises of the party whose property is searched, and

one accused will not be heard to object that the search of the property or premises of some third person is a violation of his constitutional rights." See Combs v. State, 94 Okl.Cr. 206, 233 P.2d 314; Sears v. State, 79 Okl.Cr. 437, 156 P.2d 145; Bynum v. State, 40 Okl.Cr. 352, 268 P. 993.

The most recent case in which the question was discussed was McDoulett v. State, Okl.Cr., 368 P.2d 522, which is a case very much in point and the defendant was denied relief because ownership of the automobile was never established.

■ Since evidence of ownership or proprietory interest was objected to and was never shown, the search and seizure could not be considered as a violation of defendant's constitutional rights. Defendant filed no Motion to Suppress, but raised it by objection to Introduction of Evidence during course of trial. He should have offered evidence to support his motion by proving ownership, that the officer had no search warrant, and that the search was not incidental to a lawful arrest.

This Court held where defendant raises the question of the illegality of a search, the burden is upon him to introduce evidence to sustain his Motion. See Combs v. State, supra.

Defendant's second contention is that the pillow case discovered in the search was inadmissible because it was merely evidentiary matter and not subject to search and seizure. The same rule would be applicable as to the fruits of the search as well as the search and seizure.

■ It was held by this Court in the case of Fitzgerald v. State, 65 Okl.Cr. 1, 83 P.2d 581, that:

"The immunity from *prejudicial consequences* of an illegal search and seizure is a personal one, and the right to object thereto can be claimed only by the party whose premises have been invaded." See also, Stokes v. State, 65 Okl.Cr. 326, 86 P.2d 642.

■ Defendant's contention that the verdict is not sustained by the evidence is without merit. The testimony of the complaining witness was wholly unrefuted. Her testimony was sufficient, if believed, to support a charge of Rape in the First Degree. Her testimony was supported by her girl companions who testified that she left in the company of the three defendants. Her testimony was corroborated by the examining physician, who said he found bruises, lacerations and blood in the vagina, and in his opinion, she had intercourse within 2 or 3 hours. That in his opinion, the bruises were made by a penis. That there were dead male sperm in the vagina. (She testified the boys forced her to take a douche with some kind of tincture that burned.) She called police at the first opportunity. Officer Swidler who answered the call said she was crying and her clothes were wet and mussed up. Though some of the bestial act related by the prosecuting witness were difficult to fathom, she told them in a clear, convincing manner. We will not substitute our opinion for that of the jury. They had opportunity to hear the witness and adjudge her credibility.

■ This Court held in the case of Stott v. State, 44 Okl.Cr. 306, 280 P. 634, that:

"It is not for this court to substitute its judgment on questions of fact, or of the weight of the evidence, for that of the jury, where there is competent evidence from which the jury may reasonably and logically find the guilt of the defendant, even though the evidence may be conflicting, or such that different inferences might reasonably be drawn therefrom."

Also, see Browning v. State, 31 Okl.Cr. 373, 239 P. 272.

A thorough review of the record presents no error sufficient to justify reversal, therefore, the judgment and sentence of the trial court is hereby affirmed.

BRETT and BUSSEY, JJ., concur.